| | |
|---|---|
| Bernadine Stewart,<br><br>      Plaintiff,<br><br>v.<br><br>Rise, Inc.,<br><br>      Defendant. | Case No. 12-cv-1187 (SRN/SER)<br><br><br>**MEMORANDUM OPINION<br>AND ORDER** |

Stephen C. Fiebiger, Stephen C. Fiebiger Law Office, Chartered, 2500 West County Road 42, Suite 190, Burnsville, Minnesota 55337, for Plaintiff.

Michael D. O'Neill and Pamela M. Harris, Martin & Squires PA, 332 Minnesota Street, W2750, Saint Paul, Minnesota 55101, for Defendant.

SUSAN RICHARD NELSON, United States District Judge

## I.    INTRODUCTION

Plaintiff Bernadine Stewart sued her employer, Rise, Inc., ("Rise") for discrimination on account of her race, sex, and national origin in violation of Title VII of the Civil Rights Act of 1964, the Minnesota Human Rights Act, and 42 U.S.C. § 1981 (Counts 1, 3, and 4).  (Compl. ¶¶ 42-43, 46-48 [Doc. No. 1].)  Ms. Stewart also sued Rise for retaliation under Title VII (Count 2).  (Id. ¶¶ 44-45).  Ms. Stewart further alleges a whistleblower claim against Rise under Minn. Stat. § 181.932 (Count 5).  (Id. ¶ 49.)

This matter is before the Court on Rise's Motion for Summary Judgment [Doc. No. 20].  For the reasons that follow, the Court grants Rise's motion.

## II. BACKGROUND

### A. The Parties

Rise is a non-profit organization that supports people with disabilities and other barriers to employment through vocational programs and services. (Decl. of Lynn Marie Noren ¶ 3 [Doc. No. 26].) The Rise Pathways program, started in 1999, serves recipients of the Minnesota Family Investment Program ("MFIP"), Minnesota's primary welfare program for low-income families with children. (Id. ¶ 8.) MFIP aims to help clients obtain employment and achieve self-sufficiency. (Id.)

From January 22, 2007 until March 12, 2012, Ms. Stewart was the coordinator of MFIP at Rise's Minneapolis office. (Compl. ¶ 5 [Doc. No. 1].) In this role, Ms. Stewart supervised staff who handled cases of program participants. (Id.) Ms. Stewart was supervised by Truc Pham, who primarily worked out of Rise's office in Spring Lake Park, Minnesota. (Id. ¶ 6.)

### B. Rise's Anti-Discrimination Policy and Training

In the first year of her employment, Ms. Stewart reviewed and acknowledged receipt of Rise's 2007 Personnel Manual. (Ex. 1 to Stewart Dep. [Doc. No. 23-2].) This Manual explained that discriminatory conduct would not be tolerated, and it set forth the procedures for reporting discriminatory conduct.[1] (Dep. of Bernadine Stewart at 21-22

---

[1] The Conflict Resolution portion of Rise's policy states that the employee should:

- Discuss the concern with your supervisor.
- If your concern is not resolved within five working days after discussing it with your supervisor, take your concern to the next level of management.
- If your problem is not resolved within thirty days after completing step two,

[Doc. No. 23-1]; Ex. 2 to Stewart Dep. [Doc. No. 23-2].) In addition, Ms. Stewart reviewed, acknowledged, and signed Rise's Code of Conduct each year from 2007 to 2011, affirming that:

> To the best of my knowledge, I am unaware of any possible violations of the standards described in the attached Code of Conduct and/or potential conflict of interests either by me, managers, supervisors, or other employees. I further agree to comply with the standards in the future and to report promptly any questions or concerns that I may have, as noted in the Code.

(Ex. 5 to Stewart Dep. [Doc. No. 23-2].) The Code of Conduct prohibits discrimination "of any kind," including "on the basis of race, color, creed, religion, sex, sexual orientation, national origin, age, disability, veteran status, marital status, or status with regard to public assistance." (Ex. 2 to Stewart Dep. at 5 [Doc. No. 23-2].)

Rise organized quarterly meetings and trainings to discuss "all aspects of our HR department," including discrimination and harassment issues. (Dep. of Mary Stransky at 18-21 [Doc. No. 23-4].) Rise also sent all supervisors, including Ms. Stewart, to a ten-week supervision class that addressed managing employee performance and behavior. (Id. at 18-19.)

### C. Interactions between Ms. Stewart and Her Staff

Ms. Stewart alleges that her staff created a hostile working environment and

---

present your concern in writing to the Human Resources Department with a copy to the President. The concern will be reviewed and a decision will be made, and reviewed by the Personnel Committee of the Rise Board of Directors. This decision will be made within thirty days after receipt of the written concern.
- Retaliation . . . will not be tolerated. If you feel you have been retaliated against please contact the HR Department immediately.

(Ex. 2 to Stewart Dep. at 3-4 [Doc. No. 23-2].)

discriminated against her on the basis of her race, national origin, and sex. She claims that they called her a "black female bitch." (Stewart Dep. at 108.) She also claims that male Somali staff refused to follow her instructions. (Pl.'s Answers to Def.'s Interrogatories at 5-6 [Doc. No. 36-1].) For example, when she told them to answer incoming telephone calls, they allegedly refused because they viewed answering the telephone as "women's work." (Id. at 17; Dep. of Assata Damani at 55-56 [Doc. No. 23-9].) When Ms. Stewart re-directed them from discussing non-work related topics to performing work-related tasks, they allegedly ignored Ms. Stewart. (Pl.'s Answers to Def.'s Interrogatories at 17.) Additionally, Ms. Stewart claims that male Somali staff made comments about women who wore black as "needing a man." (Id.) Ms. Stewart further alleges that Somali counselors often spoke in the Somali language, knowing that Ms. Stewart could not understand them. (Id.) Ms. Stewart generalizes that male Somali workers discriminate against black women who are born in the United States. (Stewart Dep. at 105-06.)

Ms. Stewart also alleges conduct by specific individuals at Rise, including Abdi Haid, Youssouf Robleh, Abdisalon Abdirahman, Yasin Jama, and Stephanie Ableiter. Abdi Haid, a male Somali-American counselor, was allegedly "rude, condescending, and disrespectful toward Ms. Stewart." (Pl.'s Answers to Def.'s Interrogatories at 17.) Ms. Stewart claims that Mr. Haid once threw a case file at her in the office. (Id.) Ms. Stewart also claims that on February 18, 2009, Mr. Haid yelled at her, "fuck you, everyone around here does not like you!" (Id.)

Youssouf Robleh, a male Somali counselor, allegedly yelled and slammed his

office door in an intimidating manner around Ms. Stewart.  (<u>Id.</u> at 18.)  Ms. Stewart

claims that Mr. Robleh made comments such as "Americans owe Somalis; it's okay for

Somali pirates to kill Americans and hijack their boats."  (<u>Id.</u> at 19.)

Abdisalon Abdirahman, a Somali-American male, allegedly intimidated Ms.

Stewart.  (Pl.'s Answers to Def.'s Interrogatories at 20.)  Ms. Stewart claims that after

Mr. Abdirahman was placed on a performance improvement program in January 2012, he

would move closer to her while she was seated, standing over her in a "confrontational

and defiant manner."  (<u>Id.</u>)  This conduct made Ms. Stewart feel "threatened and

intimidated in the workplace."  (<u>Id.</u>)  Ms. Stewart allegedly informed Mr. Pham about

Mr. Abdirahman's conduct.  (<u>Id.</u>)

Yasin Jama, a male Somali counselor, allegedly commented on Ms. Stewart's

attire on a regular basis and asked whether Ms. Stewart was "looking for a husband or a

man" when she wore African clothing.  (Pl.'s Answers to Def.'s Interrogatories at 6.)

Ms. Stewart claims that Mr. Jama disrespected her and ignored her directions.  (<u>Id.</u>)

Stephanie Ableiter, a Caucasian female, allegedly became insubordinate toward

Ms. Stewart at least twice and shouted, "no one here likes you" and "we're trying to get

you out of here."  (<u>Id.</u> at 17.)  Ms. Ableiter also allegedly stated in a loud voice at the

office that Ms. Stewart "was sick," which Ms. Stewart found "offensive and humiliating."

(<u>Id.</u> at 20.)  Ms. Stewart claims that Mr. Pham overheard the comment but did not

intervene or take any corrective action.  (<u>Id.</u>)

During her employment with Rise, Ms. Stewart did not make any written reports

to Rise that she had been discriminated against on the basis of race, national origin, or

sex.  (Stewart Dep. at 30-31.)  Mr. Pham states that Ms. Stewart never reported any improper conduct by Rise employees against her to him.  (Dep. of Truc Pham at 119 [Doc. No. 23-7].)  Ms. Stewart, however, maintains that she verbally reported the hostile work environment and discrimination that she allegedly experienced to Mr. Pham and Ms. Stransky, but they did not provide guidance or assistance.  (Stewart Dep. at 228-29; Pl.'s Answers to Def.'s Interrogatories at 20.)

Various employees at Rise, former and current, believe that Ms. Stewart treated African-American staff and clients more favorably than those of Somali origin.  (Decl. of Marsha Rasheed ¶ 6 [Doc. No. 25]; Decl. of Abdi Haid ¶ 7 [Doc. No. 29]; Decl. of Abdirahman Abdisalan ¶ 12 [Doc. No. 30].)  For example, Ms. Stewart allegedly permitted Assata Damani,[2] an African-American counselor at Rise, to arrive late and leave work early, whereas she monitored Mr. Haid's time very carefully and criticized him if he arrived slightly late.  (Haid Decl. ¶ 8.)  In addition, Ms. Stewart was allegedly "very hard" on Somali clients, not granting their paperwork or bus passes as freely as she did to African-American clients.  (Id. ¶ 7.)  Further, Ms. Stewart allegedly required Somali clients to make an appointment if they visited the office without an appointment, even if they raised issues that required immediate attention.  (Id. ¶ 8.)

The record shows that Ms. Stewart struggled with the interpersonal aspects of working with her staff.  For instance, Ms. Stewart sat inside her office with the door

---

[2] On March 11, 2011, Ms. Damani resigned from employment with Rise allegedly because of a hostile work environment and harassment by male Somali counselors.  (Damani Dep. at 44, 53.)  Ms. Damani claims that they did not value African-American women and acted in ways to antagonize and upset her.  (Id. at 53.)

locked for most of the day.  (Haid Decl. ¶ 12; Rasheed Decl. ¶ 5.)  Also, Ms. Stewart

would not let her staff work when she was not in the office.  (Haid Decl. ¶ 6.)  She

allegedly would not give them keys to the office, causing employees to wait outside the

office until Ms. Stewart arrived.  (Rasheed Decl. ¶ 5.)  In her working relationships, Ms.

Stewart allegedly started out "fine" with counselors, but once they challenged her, Ms.

Stewart "would change on them and take it out on them going forward."  (Id. ¶ 6.)

Various employees contrasted Ms. Stewart with her predecessor, Amina Gesale, who

worked collaboratively with her staff and allowed them more flexibility with office

hours.  (Haid Decl. ¶ 6; Decl. of Youssouf Robleh ¶14 [Doc. No. 31].)

### D.  Ms. Stewart's Performance Evaluations from 2009-2011 and the Work Participation Rate

In the formal evaluations for Ms. Stewart from 2009 through 2011, Mr. Pham

rated her interpersonal and leadership skills as falling below the performance standard.

(Stewart Dep. at 158-61.)  On March 11, 2009, Mr. Pham commented that Ms. Stewart

needed to improve her "working relationships with other supervisors, co-workers,

partners, especially staff," as well as her interpersonal skills and communication style so

that her team would view her as a leader.  (2009 Performance Appraisal at 1-2 [Doc. No.

23-3].)  On February 23, 2010, Mr. Pham gave similar feedback, additionally noting the

need for Ms. Stewart to maintain Rise's performance standards and increase the work

participation rate.  (2010 Performance Appraisal at 1-2 [Doc. No. 23-3].)  On February

23, 2011, Mr. Pham wrote that despite some improvement, Ms. Stewart needed to

"continue improving the interpersonal skills and communication style before she [Ms.

Stewart] can gain her leadership qualities." (2011 Performance Appraisal at 1-2 [Doc. No. 23-3].) Again, Mr. Pham stated the need for Ms. Stewart to increase Rise's work participation rate. (Id. at 2.) Mr. Pham also attached a chart reflecting the decrease in Rise's work participation rate from 2008 to 2011, with each year failing to meet the goal of 50%.[3] (Annual Average WPR Trend [Doc. No. 23-3].)

During her employment with Rise, Ms. Stewart did not dispute the work participation rates. On January 12, 2011, Ms. Stewart signed an acknowledgement statement that

> . . . performance toward client outcomes will be measured on a monthly basis or more frequently and I will be required to show progress toward attainment of monthly goals because failure to show progress may be grounds for reduction or reallocation of funds or termination of the Rise MFIP contract by Hennepin County.

(Ex. 13 to Stransky Dep. [Doc. No. 23-5].) On January 17, 2012, at a staff meeting that Ms. Stewart could not attend, Mr. Pham learned that Rise was no longer a welcoming place for clients; clients were asking to transfer out of Rise's program; the work environment was unsupportive and rigid; and Ms. Stewart was micromanaging and not supporting her staff. (Ex. 37 to Stransky Dep. [Doc. No. 23-6].)

**E. Rise's Decision to Terminate Ms. Stewart's Employment**

On January 24, 2012, Mr. Pham decided to terminate Ms. Stewart's employment. (Pham Dep. at 163.) He based the decision on the decreasing work participation rate, the lack of improvement to the program, the issues and complaints concerning Ms. Stewart,

---

[3] Rise's work participation rate was 39.7% in 2008, 24.7% in 2009, 26.2% in 2010, and 18.2% in 2011. (Id.)

and the "total breakdown in the management of that department." (Stransky Dep. at 137.) The Human Resources department supported Mr. Pham's decision. (Id.) Mr. Pham then drafted a memorandum, dated January 27, 2012, stating the decision to terminate Ms. Stewart's employment with Rise. (Ex. 41 to Stransky Dep. [Doc. No. 23-6].) This memorandum stated in part:

> . . . the Pathways program has not performed up to the expectations of Hennepin County. Our participation rate has been declining since 2010 and we had the second lowest participation rate of 23 agencies in 2011.

> This is a trend that I must change in order to keep the program viable. After careful discussion with Don Lavin I have decided to make a change in the program management at Pathways. I have made the decision to terminate your employment with Rise effective today.

(Id.)

On January 25, 2012, Ms. Stewart notified Rise through her doctor that due to the recent death of her mother, she needed to take time off from work. (Pham Dep. at 163.) To accommodate the request for leave, Mr. Pham decided to postpone the termination until the end of Ms. Stewart's leave. (Id.)

### F. Ms. Stewart's EEOC Charge of Discrimination

On February 6, 2012, Ms. Stewart signed a Charge of Discrimination against Rise, alleging discrimination based on race, sex, and national origin. (Ex. 44 to Stransky Dep. [Doc. No. 23-6].) The United States Equal Employment Opportunity Commission ("EEOC") prepared notices of discrimination, dated January 26, 2012 and February 17, 2012. (Exs. 45 and 46 to Stransky Dep. [Doc. No. 23-6].) On February 21, 2012, Ms. Stransky received the EEOC's documents. (Stransky Dep. at 148.)

**G. Implemented Termination of Ms. Stewart's Employment**

Ms. Stewart's termination ultimately occurred on March 12, 2012, when it became clear that she was back from leave. (Id. at 169.) Rise revised the date on the previously drafted termination memorandum, and it elaborated on the reasons for terminating Ms. Stewart. (Pham Dep. at 160-61.) The updated memorandum allegedly included more facts about the work participation rate, the fact that the work participation rate was not improving, and the threatened viability of the MFIP. (Id.)

**III.    DISCUSSION**

**A. Standard of Review**

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). A dispute over a fact is "material" only if its resolution might affect the outcome of the suit under the governing substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute over a fact is "genuine" only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. (Id.) In considering a motion for summary judgment, the court views the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party. Enter. Bank v. Magna Bank of Missouri, 92 F.3d 743, 747 (8th Cir. 1996). The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Id. The party opposing a properly supported motion for summary judgment may not rest on mere allegations or denials, but

must set forth specific facts in the record showing that there is a genuine issue for trial. Anderson, 477 U.S. at 256.

## B. Discrimination Claims

Title VII of the Civil Rights Act of 1964 and the Minnesota Human Rights Act prohibit an employer from discriminating against any individual on the basis of race, national origin, or sex. See 42 U.S.C. § 2000e-2(a); MINN. STAT. § 363A.08, subd. 2. Similarly, Section 1981, as amended by the Civil Rights Act of 1991, provides a cause of action for discrimination in the employment relationship. 42 U.S.C. § 1981; Bogren v. Minnesota, 236 F.3d 399, 408 (8th Cir. 2000). An employee may establish unlawful employment discrimination under Title VII or Section 1981 through (1) direct evidence or (2) indirect evidence, as described in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-03 (1973). Takele v. Mayo Clinic, 576 F.3d 834, 838 (8th Cir. 2009). Where the plaintiff has direct evidence of discrimination—e.g., an admission by a decision maker that he acted on a forbidden basis—the plaintiff simply submits her evidence to the fact finder. Darke v. Lurie Besikof Lapidus & Co., LLP, 550 F. Supp. 2d 1032, 1040 (D. Minn. 2008). When a plaintiff instead has indirect evidence of intentional discrimination, then the plaintiff may rely on McDonnell Douglas' burden-shifting framework to avoid summary judgment. Id. The same analysis applies to MHRA claims. Torgerson v. City of Rochester, 643 F.3d 1031, 1043 (8th Cir. 2011)

Rise contends that Ms. Stewart has no direct evidence of discrimination, and Ms. Stewart does not argue to the contrary. Thus, the Court analyzes Ms. Stewart's discrimination claims under the indirect method, using the burden-shifting framework of

McDonnell Douglas.  At the initial step, Ms. Stewart must make a prima facie case of discrimination, which entails showing that: (1) she belonged to a protected group; (2) she was qualified for the position in question or was meeting her employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discrimination.  See Elnashar v. Speedway SuperAmerica, LLC, 484 F.3d 1046, 1055 (8th Cir. 2007).  If she makes a prima facie case, Rise has the burden of production to provide a legitimate, non-discriminatory explanation for the adverse action.  See id.  The burden then shifts to Ms. Stewart to show that Rise's proffered explanation is pretextual, and that discrimination is the true reason for the adverse action.  See id.

### 1.  Prima Facie Case

The parties contest whether Ms. Stewart can establish the second and fourth elements of a prima facie case of discrimination.  Rise argues that by the end of 2011, Ms. Stewart had become unqualified to lead the MFIP.  (Mem. in Supp. of Def.'s Mot. for Summ. J. at 24 [Doc. No. 22].)  Rise also argues that the facts do not show that Ms. Stewart was terminated on any basis other than her poor performance regarding the work participation rate and her relationships with the staff.  (Id. at 25.)  In opposition, Ms. Stewart argues that she was qualified for the MFIP position, and that Rise's alleged reason for firing her is pretext for discrimination.  (Pl.'s Mem. of Law in Opp'n to Summ. J. at 38-48 [Doc. No. 34].)

### a.  Whether Ms. Stewart Met Rise's Legitimate Expectations

At issue is whether Ms. Stewart was qualified for her position or was meeting

Rise's legitimate expectations for her as a supervisor.  In each of her performance evaluations from 2009 to 2011, Mr. Pham rated her interpersonal and leadership skills as falling below the performance standard.  (Stewart Dep. at 158-161; 2009-2011 Performance Appraisals [Doc. No. 23-3].)  He also repeatedly stated the need for Ms. Stewart to increase Rise's work participation rate—a crucial factor for MFIP to continue receiving funding from Hennepin County.  (2009-2011 Performance Appraisals [Doc. No. 23-3].)  The record shows that Rise's work participation rate continued to decrease under Ms. Stewart's leadership, and that her interpersonal challenges with staff did not improve.  (2008-2011 Annual Average WPR Trend [Doc. No. 23-3].)  Despite Ms. Stewart's own assertions that she was qualified to lead her department, the record reflects otherwise.  The Court concludes that Ms. Stewart cannot establish the second element of a prima facie case.

### b.  Whether Ms. Stewart's Termination Occurred Under Circumstances Giving Rise to an Inference of Discrimination

Another issue is whether Ms. Stewart's termination occurred under circumstances giving rise to an inference of discrimination.  Evidence of pretext, normally considered only at the third step of the McDonnell Douglas analysis, can satisfy the inference-of-discrimination element of the prima facie case.  Putman v. Unity Health Sys., 348 F.3d 732, 736 (8th Cir. 2003).  A plaintiff may show pretext, among other ways, by demonstrating that an employer (1) failed to follow its own policies; (2) treated similarly-situated employees in a disparate manner; or (3) shifted its explanation of the employment decision.  Arnold v. Nursing & Rehab. Ctr. at Good Shepherd, LLC, 471

F.3d 843, 847 (8th Cir. 2006) (abrogated on other grounds).

Ms. Stewart contends that Rise failed to follow its harassment and conflict resolution policies for Ms. Stewart's complaints and her EEOC charge of discrimination. (Pl.'s Mem. of Law in Opp'n to Summ. J. at 40 [Doc. No. 34].)  The Court respectfully disagrees.  The record, other than Ms. Stewart's self-serving statements, does not indicate that Ms. Stewart reported any complaints about discrimination to Rise's management. (Stewart Dep. at 228-29; Pl.'s Answers to Def.'s Interrogatories at 20.)  Mr. Pham states that Ms. Stewart never reported any improper conduct by Rise employees against her to him.  (Pham Dep. at 119.)  Ms. Stewart concedes that she did not make written reports to Rise about any discrimination against her on the basis of race, national origin, or sex. (Stewart Dep. at 30-31.)  Without more, Ms. Stewart has not shown that she reported the alleged discrimination to Rise, as needed to trigger a response under Rise's harassment and conflict management policies.

As for Ms. Stewart's report of discrimination to the EEOC, dated February 6, 2012, Rise received notice of the discrimination charge after it decided to terminate Ms. Stewart.  The record reflects that Rise prepared to terminate Ms. Stewart on January 27, 2012, and Ms. Stransky received the EEOC's notices on February 21, 2012.  (Ex. 41 to Stransky Dep. [Doc. No. 23-6]; Stransky Dep. at 148.)  But for Ms. Stewart's request for leave and Rise's accommodation of the request, Ms. Stewart was set for termination before Rise received notice of the EEOC charge.  Accordingly, the Court declines to find that Rise's alleged failure to follow its harassment and conflict resolution policies after receiving notice of the EEOC charge supports a finding of pretext.

Ms. Stewart additionally argues that Mr. Pham's changing reasons for terminating her are evidence of pretext. (Pl.'s Mem. of Law in Opp'n to Summ. J. at 48 [Doc. No. 34].) Again, the Court respectfully disagrees. "Pretext may be shown with evidence that the employer's reason for the termination has changed substantially over time." Loeb v. Best Buy Co., Inc., 537 F.3d 867, 873 (8th Cir. 2008). For example, pretext was evident when an employer first claimed to have fired an employee "due to corporate reorganization," but later claimed discharge on grounds of poor performance. Scheidecker v. Arvig Enters., Inc., 122 F. Supp. 2d 1031, 1041 (D. Minn. 2000). Here, however, the record shows that Rise terminated Ms. Stewart because of the program's low work participation rate under her leadership. The initial termination memorandum, dated January 27, 2012, noted that the declining work participation rate was

> a trend that I [Mr. Pham] must change in order to keep the program viable. After careful discussion with Don Lavin I have decided to make a change in the program management at Pathways. I have made the decision to terminate your employment with Rise effective today.

(Ex. 41 to Stransky Dep. [Doc. No. 23-6].) When Ms. Stewart's termination ultimately occurred on March 12, 2012, Rise still cited the work participation rate as the reason for her termination, and it provided more information about the work participation rate and its impact on the MFIP's viability. (Pham Dep. at 160-61.) And when Mr. Pham stated that he terminated Ms. Stewart because of the decreasing work participation rate, the lack of improvement to the program, the issues and complaints concerning Ms. Stewart, and the "total breakdown in the management of that department," the concern about the work participation rate remained a constant. Therefore, the Court does not find pretext on the

basis of Rise's allegedly changing reasons for Ms. Stewart's termination.

Finally, the Court notes that the allegedly discriminatory comments by Ms. Stewart's staff toward her do not establish pretext, because they are stray remarks by non-decision makers. See Simmons v. Oce-USA, Inc., 174 F.3d 913, 916 (8th Cir. 1999) (incorporating the "stray remarks doctrine" into the court's analysis of pretext in the McDonnell Douglas burden-shifting framework). Ms. Stewart wholly attributes the alleged statements to staff members at Rise, not to any decision makers. Even if the comments came from decision makers at Rise, Ms. Stewart has not shown that they relate to the decisional process of her termination. The Court concludes that the alleged remarks, without more, fail to create a genuine issue of fact on the question of pretext.

Because Ms. Stewart fails to show that (1) she was qualified for her position or was meeting Rise's legitimate expectations of her as a supervisor, and (2) the adverse employment action occurred under circumstances giving rise to an inference of discrimination, Ms. Stewart has not presented a prima facie case of discrimination.

### 2. Legitimate, Non-Discriminatory Reason

Even if the Court found that Ms. Stewart established a prima facie case, Rise can rebut the inference of unlawful discrimination by offering a legitimate, non-discriminatory reason for its decision to terminate Ms. Stewart. "This burden is one of production, not persuasion; it 'can involve no credibility assessment.'" Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000). A proffered legitimate, non-discriminatory reason need not be correct if the employer honestly believed the asserted grounds at the time of the adverse employment action. Twymon v. Wells Fargo & Co.,

462 F.3d 925, 935 (8th Cir. 2006).

Rise contends that it terminated Ms. Stewart because of the decreasing work participation rate, the lack of improvement to the program, the issues and complaints concerning Ms. Stewart, and the "total breakdown in the management of that department." (Stransky Dep. at 137.) The Court finds that Rise has met its burden of producing a legitimate, non-discriminatory reason for terminating Ms. Stewart.

### 3. Pretext

Because Rise has offered a legitimate, non-discriminatory reason for terminating Ms. Stewart, Rise is entitled to summary judgment unless Ms. Stewart submits evidence sufficient to show that Rise's explanation is pretextual, and that animus based on race, national origin, or sex was the real reason for Rise's adverse action. See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 519 (1993). As discussed earlier, Ms. Stewart has not shown that Rise's explanation for her termination is pretextual for discrimination. Supra Part III(B)(1)(b).

In short, Ms. Stewart demonstrated neither direct nor indirect evidence of Rise's discrimination against her on the basis of race, national origin, and sex. Under McDonnell Douglas, Ms. Stewart has not established a prima facie case. Even if she had, Rise produced a legitimate, non-discriminatory explanation for Ms. Stewart's termination, and Ms. Stewart has not presented sufficient evidence to create an issue of fact that Rise's articulated reason for the termination was pretextual. For these reasons, the Court grants Rise's motion for summary judgment on the discrimination claims.

### C. Hostile Work Environment Claim

To establish a hostile work environment claim, Mr. Stewart must prove that: (1) she belongs to a protected group; (2) she was subject to unwelcome harassment based on her race, national origin, or sex; (3) the harassment affected a term, condition, or privilege of employment; (4) her employer knew or should have known of the harassment; and (5) the employer failed to take proper action. See Peterson v. Scott Cnty., 406 F.3d 515, 523-24 (8th Cir. 2005) (abrogated on other grounds). Harassment is actionable when it is so "severe or pervasive" as to "alter the conditions of [the victim's] employment and create an abusive working environment." Faragher v. City of Boca Raton, 524 U.S. 775, 786 (1998). In determining whether the alleged harassment creates a hostile work environment, courts consider the frequency of the offending conduct, its severity, whether it was physically threatening or humiliating, and whether it unreasonably interfered with work performance. Hesse v. Avis Rent A Car Sys., Inc., 394 F.3d 624, 630 (8th Cir. 2005). The Eighth Circuit has "repeatedly emphasized that anti-discrimination laws do not create a general civility code. Conduct that is merely rude, abrasive, unkind, or insensitive does not come within the scope of the law." Shaver v. Indep. Stave Co., 350 F.3d 716, 721 (8th Cir. 2003).

In this case, Ms. Stewart generally asserts that her staff subjected her to a hostile work environment because they called her a "black female bitch"; refused to follow her instructions; made comments about women who wore black as "needing a man"; and often spoke in the Somali language, which Ms. Stewart could not understand. (Stewart Dep. at 108; Pl.'s Answers to Def.'s Interrogatories at 5-6, 17.) Ms. Stewart also alleges

that specific individuals at Rise created a hostile working environment. These individuals include:

- **Abdhi Haid**, who allegedly (1) threw a case file at her in the office, and (2) yelled, "fuck you, everyone around here does not like you!" on February 18, 2009;

- **Youssouf Robleh**, who allegedly (1) yelled and slammed his office door in an intimidating manner around Ms. Stewart, and (2) commented that "Americans owe Somalis; it's okay for Somali pirates to kill Americans and hijack their boats";

- **Abdisalon Abdirahman**, who allegedly moved closer to Ms. Stewart while she was seated, standing over her in a "confrontational and defiant manner";

- **Yasin Jama**, who allegedly commented on Ms. Stewart's attire and asked whether she was "looking for a husband or a man" when she wore African clothing; and

- **Stephanie Ableiter**, who allegedly shouted to Ms. Stewart, "no one here likes you," "we're trying to get you out of here," and publicly stated that Ms. Stewart "was sick."

These incidents, while entirely inappropriate and rude, are not sufficiently severe or pervasive to establish a hostile work environment. Ms. Stewart has not shown that the alleged statements and conduct were more than isolated incidents. Nor has she shown that they necessarily occurred because of Ms. Stewart's race, national origin, or sex.

Even if the alleged harassment were sufficiently severe and pervasive to affect the terms, conditions, or privileges of her employment, Rise has an affirmative defense under Burlington Indus., Inc. v. Ellerth, 524 U.S. 742 (1998) and Faragher v. City of Boca Raton, 524 U.S. 775 (1998), to warrant dismissal of Ms. Stewart's hostile work

environment claim.  An employer is entitled to such dismissal upon showing that (1) it "exercised reasonable care to prevent and correct promptly any sexually harassing behavior," and (2) the "employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to avoid harm otherwise."  Frieler v. Carlson Mktg. Grp., Inc., 751 N.W.2d 558, 570-71 (Minn. 2008) (applying Ellerth/Faragher defense in MHRA claim).

Ms. Stewart asserts that she reported the staff's conduct toward her to Mr. Pham and Ms. Stransky, who allegedly ignored her complaints and took no corrective action. (Pl.'s Mem. of Law in Opp'n to Summ. J. at 49 [Doc. No. 34].)  The record does not support Ms. Stewart's position.  To the contrary, it shows that Ms. Stewart did not make any written reports to Rise that she had been discriminated against on the basis of race, national origin, or sex.  (Stewart Dep. at 30-31.)  Mr. Pham similarly states that Ms. Stewart never reported any improper conduct by Rise employees against her to him. (Pham Dep. at 119.)  Moreover, each year from 2007 to 2011, Ms. Stewart affirmed that she was "unaware of any possible violations of the standards described" in the Code of Conduct.  (Ex. 5 to Stewart Dep. [Doc. No. 23-2].)  Without more than Ms. Stewart's self-serving statements, the Court finds that Ms. Stewart did not "take advantage of any preventative or corrective opportunities" provided by Rise, thereby satisfying the second element of the defense.

The Court also finds that the first element of the Ellerth/Faragher defense is met. The record shows that Rise had various anti-discrimination policies and trainings in place.  For example, Rise's Personnel Manual explained that discriminatory conduct

would not be tolerated, and it set forth the procedures for reporting discriminatory conduct. (Exs. 1 and 2 to Stewart Dep. [Doc. No. 23-2].) Rise's Code of Conduct also prohibited discrimination "of any kind," including "on the basis of race, color, creed, religion, sex, sexual orientation, national origin, age, disability, veteran status, marital status, or status with regard to public assistance." (Ex. 2 to Stewart Dep. at 5 [Doc. No. 23-3].) Further, Rise provided trainings and quarterly meetings to address discrimination and harassment issues, which Ms. Stewart attended. (Stransky Dep. at 18-21.) Finally, the record suggests that Ms. Stewart could have complained about any harassment by her staff to Rise's management. These circumstances show that Rise took reasonable care to prevent any sexually harassing behavior.

For these reasons, the Court grants Rise's motion for summary judgment on Ms. Stewart's hostile work environment claim.

### D. Retaliation and Whistleblower Claims

Federal law prohibits an employer from discriminating against an employee who "has opposed any practice" made unlawful by Title VII, or "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding or hearing" under the statute. 42 U.S.C. § 2000e-3(a); see Barker v. Missouri Dep't of Corr., 513 F.3d 831, 834 (8th Cir. 2008). And under Minnesota's Whistleblower Act,

> An employer shall not discharge, discipline, threaten, otherwise discriminate against, or penalize an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because:
>
> (1) the employee, or a person acting on behalf of an employee, in good faith, reports a violation, suspected violation, or planned violation of any

federal or state law or common law or rule adopted pursuant to law to an employer or to any governmental body or law enforcement official.

MINN. STAT. § 181.932, subd. 1.  In the absence of direct evidence, as here, Ms.

Stewart's Title VII retaliation claim and Minnesota whistleblower claim are analyzed

under the McDonnell Douglas burden-shifting framework.  See McDonald v. City of St.

Paul, 679 F.3d 698, 707 (8th Cir. 2012) (applying McDonnell Douglas framework to

Title VII and MHRA retaliation claims); Hitchcock v. FedEx Ground Package Sys., Inc.,

442 F.3d 1104, 1106 (8th Cir. 2006) (applying McDonnell Douglas framework to claims

under Minn. Stat. § 181.932).

### 1.  Prima Facie Case

To establish a prima facie case of retaliation, Ms. Stewart must show that (1) she

engaged in protected conduct, (2) reasonable employees would have found the challenged

retaliatory action materially adverse, and (3) the materially adverse action was causally

linked to the protected conduct.[4]  Weger v. City of Ladue, 500 F.3d 710, 726 (8th Cir.

2007).  A "materially adverse action" is one that "would have 'dissuaded a reasonable

worker from making or supporting a claim of discrimination.'"  Hervey v. Cnty. of

Koochiching, 527 F.3d 711, 722 (8th Cir. 2008).

Ms. Stewart alleges that Rise terminated her employment on March 12, 2012, in

retaliation for filing her charge of discrimination with the EEOC on February 6, 2012,

and complaining about a hostile work environment to Rise.  (Compl. ¶ 44 [Doc. No. 1].)

---

[4] The elements of a Title VII retaliation claim are the same as those defined under the Minnesota Whistleblower Act, Minn. Stat. § 181.932.  Green v. Franklin Nat. Bank of Minneapolis, 459 F.3d 903, 914 n.8 (8th Cir. 2006).  Thus, the Court's analysis of Ms. Stewart's retaliation claim also applies to her whistleblower claim.

At issue is the third element of a prima facie case: whether the termination of Ms. Stewart was causally linked to the protected conduct. Ms. Stewart relies on the timing of her protected activity and subsequent termination to establish that Rise's actions were retaliatory. (Pl.'s Mem. of Law in Opp'n to Summ. J. at 53-54 [Doc. No. 34].)

Generally, however, "more than a temporal connection between the protected conduct and the adverse employment action is required to present a genuine factual issue on retaliation." Hervey, 527 F.3d at 723. Additionally, "[e]vidence that the employer had been concerned about a problem before the employee engaged in the protected activity undercuts the significance of the temporal proximity." Smith v. Allen Health Sys., Inc., 302 F.3d 827, 834 (8th Cir. 2002).

In her efforts to establish a prima facie case, Ms. Stewart's focus on the time frame between her EEOC charge on February 6, 2012, and her ultimate termination on March 12, 2012, is misplaced. The record shows that Rise's decision to terminate Ms. Stewart predates the filing of her discrimination charge with the EEOC. On January 24, 2012, Mr. Pham decided to terminate Ms. Stewart, and he memorialized the decision in a memorandum dated January 27, 2012, with termination effective as of January 27, 2012. (Stransky Dep. at 137; Ex. 41 to Stransky Dep. [Doc. No. 23-6].) On January 25, 2012, however, Ms. Stewart notified Rise that due to the death of her mother, she needed to take time off from work. (Pham Dep. at 163.) Consequently, Mr. Pham postponed the termination until the end of Ms. Stewart's leave. Ms. Stewart overlooks the fact that but for Mr. Pham's accommodation of her request for time off from work, she would have been terminated before she filed her discrimination charge with the EEOC.

Moreover, the record shows that Rise's concerns about Ms. Stewart's performance predate her charge of discrimination with the EEOC or any alleged complaints about a hostile work environment. Notably, the 2009-2011 Performance Appraisals and the termination memorandum support Mr. Pham's and Ms. Stransky's testimony that Rise terminated Ms. Stewart because of the decreasing work participation rate, the lack of improvement to the program, the issues and complaints concerning Ms. Stewart, and the "total breakdown in the management of that department." (Pham Dep. at 158; Stransky Dep. at 137.) The record does not support a reasonable inference of retaliation for protected activity.

For these reasons, the Court finds that Ms. Stewart has not established a prima facie case for her retaliation and whistleblower claims.

### 2. Legitimate, Non-Discriminatory Reason

Even if the Court found that Ms. Stewart established a prima facie case, Rise has offered a legitimate, non-discriminatory reason for its decision to terminate Ms. Stewart. By claiming that it terminated Ms. Stewart because of the declining work participation rate, the lack of improvement to the program, and the concerns about Ms. Stewart's interpersonal skills, Rise meets its burden here.

### 3. Pretext

To overcome summary judgment, Ms. Stewart must identify evidence sufficient to permit a reasonable jury to find that Rise's explanation for her termination is pretext. Ms. Stewart applies her earlier arguments about pretext, <u>supra</u> Part III(B)(1)(b), to her retaliation and whistleblower claims. (Pl.'s Mem. of Law in Opp'n to Summ. J. at 55

[Doc. No. 34].)

Ms. Stewart has not provided evidence that Rise's reasons for terminating her were pretext for retaliation. As discussed earlier, Rise was concerned about the low work participation rate under Ms. Stewart's leadership and her poor interpersonal skills long before her termination on March 12, 2012. Additionally, the decision to terminate Ms. Stewart occurred in January 2012, before she filed her charge of discrimination with the EEOC in February 2012. Accordingly, the Court concludes that Ms. Stewart's retaliation and whistleblower claims fail as a matter of law.

In summary, Ms. Stewart has not established a prima facie case for retaliation. Even if she had, Rise offered legitimate, non-discriminatory reasons for Ms. Stewart's termination, and Ms. Stewart has not shown that they are pretext. The Court therefore grants Rise's motion for summary judgment on the retaliation claim. As the Court treats Ms. Stewart's whistleblower claim as analogous to her retaliation claim, it grants summary judgment on the whistleblower claim as well.

## IV. ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED THAT:**

1. Defendant's Motion for Summary Judgment [Doc. No. 20] is **GRANTED**, and

2. Plaintiff's Complaint [Doc. No. 1] is **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACORDINGLY.**

Dated:     October 31, 2013          s/ Susan Richard Nelson
                                               SUSAN RICHARD NELSON
                                             United States District Court Judge